**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LINDA KAY BEAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **11 C 74** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **MICHAEL J. ASTRUE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Linda Kay Bean ("Bean" or "claimant"), has brought a motion for summary judgment [16] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her request for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). In his response [18], the Commissioner asks the Court to affirm the decision of the Administrative Law Judge ("ALJ"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted in part.

**I.     Background**

**A.        Procedural History**

Bean filed an application for period of disability and disability insurance benefits on February 28, 2008, alleging disability beginning June 2, 2006 due to fibromyalgia, depression, arthritis, headaches, and temporomandibular joint disorder ("TMJ"). Bean's applications were denied initially on June 19, 2008, and upon reconsideration on July 22, 2008. (R. 89-93, 95-98.) Bean filed a timely request for a hearing. (R. 99-100.) On

September 16, 2009, Bean appeared for a hearing before ALJ Denise McDuffie Martin. (R. 39-86.)  On October 23, 2009, the ALJ issued a decision denying Bean's disability claim.  (R. 17-34.)  Bean then filed a timely request for review before the Appeals Council.  (R. 12.)  On November 9, 2010, the Appeals Council denied Bean's request (R. 1-3), at which time the ALJ's decision became the final decision of the Commissioner.  *Tumminaro v. Astrue*, 671 F.3d 629, 632 (7th Cir. 2011).  This action followed.

### B.    Medical Evidence

#### 1.    Treating Physicians

Dr. Margo Wolf of Family Practice Consultants, LTD reported that she treated claimant four times a year beginning in 2006.  (R. 308.)  However, the earliest record specifically from Dr. Wolf is dated January 18, 2007, at which time she ordered an MRI of Bean's right hip after Bean complained of pain in that region.[1]  (R. 241.)  That MRI revealed a "high grade strain or partial tear of the greater trochanteric insertion of the gluteus minimus muscle."  (*Id.*)  "No osseous abnormalities" were demonstrated in the right hip.  (*Id.*)

On January 30, 2007, claimant saw Dr. Jerry E. Bertolini for her increasing right hip pain.  (R. 243.)  Dr. Bertolini's examination revealed that claimant's hip was not at all tender and that she had a full range of motion without pain.  (*Id.*)  Straight leg raising was positive at 80 degrees on the right, but negative on the left.  (*Id.*)  Dr. Bertolini

---

[1] The record does include 2006 records from other physicians at Family Practice Consultants.  (R. 296-305.)  Those records reveal that Bean underwent a mammogram and received treatment for high blood pressure in 2006.

obtained x-rays of the lumbar spine, which showed mild degenerative changes at L3-4. (*Id.*)  Dr. Bertolini ultimately concluded that Bean's right hip pain referred from the back and that the questionable partial tear of the gluteus minimus was insignificant and may have been over read.  (*Id.*)  Dr. Bertolini did assess degenerative disc disease at L3-4, but ruled out bulging disc at L3-4 or at L4-5.  (*Id.*)  Dr. Bertolini offered claimant therapy, but she declined, expressing preference to do her own.  (*Id.*)  Bean cancelled her next appointment with Dr. Bertolini.  (*Id.*)

Claimant returned to see Dr. Wolf on March 28, 2008.  (R. 249-51.)  Dr. Wolf noted a history of fibromyalgia.  (R. 249.)  Claimant complained that she could not sit or stand for any period of time, could walk only half of a block or less, could lift only twenty pounds, and could not walk up stairs.  (*Id.*)  She further explained that she experienced pain in her hands and had difficulty working buttons.  (*Id.*)  Claimant also complained of problems with short term memory and staying focused on tasks.  (*Id.*)  Dr. Wolf's physical exam revealed unremarkable results.  (R. 249-50.)  She assessed fibromyalgia and prescribed Elavil, Vicodin, Hydrocodone, and Meloxicam.  (R. 250-51.)

On October 3, 2008, claimant saw Dr. Wolf and complained of an all-over worsening pain.  (R. 293.)  She also reported "depressive symptoms."  (R. 294.)  Dr. Wolf's physical exam revealed, among other things, bilateral upper, middle and lower paraspinal muscle tenderness, bilateral subacromial bursa tenderness, bilateral subdeltoid bursa tenderness, and left biceps and deltoid muscle tenderness.  (*Id.*)  Dr. Wolf also noted hand and wrist tenderness in both upper extremities and podagra in both lower extremities.  (*Id.*)  Dr. Wolf prescribed Elavil, Hydrocodone, and Lyrica.  (R. 295.)

Dr. Wolf also completed a Multiple Impairment Questionnaire on October 3, 2008. (R. 308-16.) Dr. Wolf reported her diagnosis as fibromyalgia, depression, and arthritis, with a "guarded" prognosis. (R. 308.) In support of her diagnosis, Dr. Wolf cited swollen, twisted fingers, trigger point findings, and the 2007 MRI of the right hip. (*Id.*) Dr. Wolf recorded claimant's primary symptoms as pain in the bilateral hands, knees, hips, and spine, and all of her muscles, which had progressively worsened since 2005. (R. 309, 315.) She estimated claimant's pain and fatigue levels as a nine on a ten-point scale. (R. 311.)

According to Dr. Wolf, claimant could sit, stand, and walk for less than one hour in an eight-hour day and must get up and move around at least every fifteen minutes. (R. 312.) Dr. Wolf also concluded that claimant could only occasionally lift and carry zero to five pounds. (R. 312.) She noted marked limitations in claimant's ability to grasp, turn, and twist objects, fine manipulations, and reaching. (R. 312-13.) In Dr. Wolf's opinion, claimant was not capable of pushing, pulling, kneeling, bending, or stooping. (R. 315.) Dr. Wolf further reported that claimant's pain, fatigue, and other symptoms constantly interfered with her attention and concentration and that she was incapable of even low stress work. (R. 314.) Dr. Wolf estimated that Bean would be absent from work more than three times a month as a result of her impairments or treatment. (R. 315.)

Claimant returned to Dr. Wolf for follow-up on November 6, 2008 and complained of musculoskeletal pain, most often in her hands and hips, as well as associated numbness, aching, and tingling. (R. 476.) The physical examination revealed tenderness of the hands and hips bilaterally. (R. 477.) Dr. Wolf assessed fibromyalgia

4

and carpal tunnel.  (R. 477-78.)  Dr. Wolf recommended an EMG of the upper

extremities and referred claimant to a rheumatologist.  (R. 478.)

The EMG and Nerve Conduction Study of the upper extremities was performed

on November 25, 2008 and showed "at least a moderately severe carpal tunnel

syndrome on the right side" and mild carpal tunnel on the left side.  (R. 325.)  There was

no evidence to suggest ulnar neuropathy at the wrist or the elbow in either upper

extremity, and there was no evidence of acute or chronic cervical radiculopathy or

brachial pelxopathy in either upper extremity.  (*Id.*)

On December 5, 2008, claimant saw Dr. Wolf and complained of headaches in

her left temple area and numbness in the arm with associated weakness.  (R. 469.)  Dr.

Wolf recommended an MRI of the brain and referred claimant to a pain

specialist/anesthesiologist.  (R. 471.)  An MRI of the brain dated December 19, 2008

revealed "nonspecific focus of FLAIR signal in the right parlatal subcortical white matter;

possible etiologies include age-related change or chronic small-vessel ischemic

changes or demyelination among other causes."  (R. 321.)  No acute intracranial

process was identified.  (*Id.*)  Mucosal thickening was noted in the sphenoid sinuses, as

was opacification of a few right-sided mastoid air cells.  (*Id.*)  On December 29, 2008,

claimant visited Dr. Wolf for a follow-up evaluation of her weakness.  (R. 464-66.)  Dr.

Wolf commented on claimant's recent MRI results and referred her to a neurologist "to

rule out MS."  (R. 464.)

On December 31, 2008, claimant began treatment with Dr. Mauricio Orbegozo at

Pain Centers of Chicago, LLC.  (R. 406-07.)  Claimant complained of pain in her right

hip, knees, hands, feet, neck, and lower back.  (*Id.*)  Claimant described the pain as an

"achy type pain" that is improved with medication and worsened by any kind of activity. (*Id.*) Dr. Orbegozo recorded claimant's average pain score as a four to five out of ten. (*Id.*) Dr. Orbegozo's physical exam revealed positive fibromyalgia points, positive limited range of motion, positive Kemp's test, and positive limited cervical range of motion. (*Id.*) Dr. Orbegozo diagnosed fibromyalgia, lumbar degenerative disc disease, and hip pain. (*Id.*) Claimant continued to see physicians at the Pain Center on a monthly basis through June of 2009. (R. 410-17.) She received prescriptions for pain medication at each visit, including Norco and Percocet. (R. 417.)

Claimant saw Dr. Nitin Nadkami on January 9, 2009 for a neurological consultation, at which time she complained of pain all over her body, disturbed sleep, poor balance, intermittent headaches, and dizziness. (R. 353.) Dr. Nadkami indicated that claimant had normal muscle tone without atrophy, "arm and leg strength grade 5," and "reflexes 2+ and symmetric." (R. 354.) Dr. Nadkami assessed chronic pain syndrome and noted that claimant's symptoms were suggestive of restless leg syndrome. (*Id.*) Dr. Nadkami ordered a sleep study and laboratory studies for collagen vascular disease and demyelinating disease. (*Id.*)

On January 22, 2009, claimant saw Dr. Phillip Leung, a pulmonologist, for a sleep study. (R. 367-69, 375-78.) Dr. Leung noted claimant's history of depression and fibromyalgia. (R. 367.) Claimant reported frequent awakening at night, excessive daytime sleepiness, and poor memory and concentration. (*Id.*) Based on the results of the sleep study, Dr. Leung diagnosed obstructive sleep apnea, hypersomnia, possible periodic limb movement, and obesity. (R. 375.) Dr. Leung recommended a sleep study with CPAP (continuous positive airway pressure), weight loss, avoidance of operation of

6

heavy machinery or motor vehicles, and the maintenance of an adequate sleep schedule. (*Id.*) Claimant underwent the CPAP study on January 29, 2009, as a result of which Dr. Leung recommended CPAP therapy. (R. 371-74.) A summary of CPAP compliance dated May 7, 2009 reveals that claimant was mostly compliant with her CPAP usage, although she denied improvement at a March 23, 2009 appointment with Dr. Leung. (R. 370, 365-66.)

At a neurological follow-up on February 3, 2009, Dr. Nadkami commented on the results of the sleep study. (R. 355.) Dr. Nadkami's exam revealed unremarkable results. (*Id.*) Dr. Nadkami prescribed Mirapex for restless leg syndrome and ordered a "spinal fluid examination for MS profile." (*Id.*) On March 3, 2009, Dr. Nadkami noted some improvement in symptoms and reported that claimant's spinal fluid examination was not compatible with MS. (R. 362.)

On April 27, 2009, claimant returned to see Dr. Wolf and reported that the severity of the pain in her right lower back was moderate, but worsening despite her ongoing treatment at the pain clinic. (R. 452-54.) She also complained of constant pain in the right hip. (R. 452.) An MRI of the lumbar spine dated May 4, 2009 revealed "mild degenerative changes at L4/L5 and L5/S1" and a "questionable small annular tear of right posterolateral L5/S1 disc without significant disc herniation, central canal narrowing or natural foraminal stenosis." (R. 448-49.) On May 18, 2009, claimant told Dr. Wolf that her back pain had improved, but that her right hip pain had not been relieved by the pain medication. (R. 443.) Dr. Wolf ordered an MRI of the right hip, which revealed "recurrent muscle strain/partial tear of the gluteus minimus and medius muscles at the greater trochanteric insertion." (R. 441.) On May 28, 2009, Dr. Wolf indicated that

claimant's symptoms were unchanged and that her pain level was moderate. (R. 439.) She noted hip tenderness and referred claimant to a neurosurgeon. (R. 440.) On July 1, 2009, claimant saw Dr. Wolf for low back pain radiating down the right leg, worsening fibromyalgia pain, and unimproved hip pain. (R. 437.)

Also on July 1, 2009, Dr. Wolf completed a second Multiple Impairment Questionnaire. (R. 428-35.) Dr. Wolf diagnosed claimant with a muscular tear of the gluteus minimus muscle and annular tear of the L5-S1 disc. (R. 428.) Dr. Wolf reported her clinical findings as right leg and back pain "for years" without improvement by medications or therapy. (*Id.*) Dr. Wolf rated claimant's pain and fatigue as severe (nine to ten on a ten-point scale). (R. 430.) Dr. Wolf indicated that claimant could sit for three to four hours and stand/walk for one hour in an eight-hour day. (*Id.*) Dr. Wolf again concluded that claimant would have to get up and move around every fifteen minutes before siting again. (*Id.*) According to Dr. Wolf, claimant could frequently lift and carry zero to five pounds and occasionally lift five to ten pounds. (R. 431.) Dr. Wolf noted significant limitations in reaching, handling, fingering, lifting, grasping, turning and twisting objects, and performing fine manipulations. (R. 431-32.) In Dr. Wolf's opinion, claimant would still be absent from work more than three times a month as a result of her impairments or treatments. (R. 433-34.)

### 2. Treating Psychiatrist

Claimant began treatment with Dr. Kelli Keller on February 24, 2009 for depression and anxiety. (R. 485.) On June 30, 2009, Dr. Keller completed a Psychiatric/Psychological Impairment Questionnaire, in which she reported that she had

treated claimant every four to six weeks since her first treatment.[2]  (R. 485-92.)  Dr.

Keller diagnosed depression, anxiety disorder, and a history of panic disorder with

agoraphobia.  (R. 485.)  The prognosis was "fair."  (*Id.*)  Dr. Keller assessed claimant's

GAF score as 55-60.  (*Id.*)  The clinical findings supporting Dr. Keller's diagnoses

included poor memory, appetite disturbance with weight change, feelings of

guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation, social

withdrawal or isolation, decreased energy, intrusive recollections of a traumatic

experience, generalized persistent anxiety, and somatization unexplained by organic

disturbances.  (R. 486.)  Dr. Keller indicated that claimant's primary symptoms were

depressed mood, anhedonia, sleep disturbances, decreased energy, decreased

concentration, and increased appetite.  (R. 487.)

Dr. Keller further opined that claimant was markedly limited in her ability to

understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; complete a normal work week without interruption

from psychologically based symptoms; accept instructions and respond appropriately to

criticism from supervisors; and set realistic goals or make plans independently.  (R.

488-90.)  Dr. Keller also found that claimant was moderately limited in her ability to

remember locations and procedures; understand, remember, and carryout one or two

step instructions; perform activities within a schedule; sustain ordinary routine without

supervision; work in coordination with or proximity to others without being distracted by

---

[2] Claimant submitted additional treatment records from Dr. Keller, as well as a narrative report
from Dr. Wolf, to the Appeals Council after the ALJ rendered her decision.  (*See* R. 493-94, 497-506, 511-
16.)  Because the ALJ did not consider those records, they "cannot now be used as a basis for finding
reversible error."  *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

them; make simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel to unfamiliar places or use public transportation. (*Id.*) According to Dr. Keller, Bean was incapable of even low stress work. (R. 491.)

### 3. State Agency Consultants

Dr. William N. Hilger conducted a psychological evaluation of claimant on May 13, 2008. (R. 253-56.) Dr. Hilger reported that claimant drove herself to the appointment and described her as neat, clean, casually dressed, and well-nourished. (R. 253.) Claimant exhibited a normal gait and posture and showed no evidence of invalidism. (*Id.*) In basic mental status testing, claimant was "fully oriented X3" and exhibited a normal affect. (*Id.*)

Bean explained that she was diagnosed with fibromyalgia and arthritis one and a half years prior to the exam. (R. 253.) She complained of "pain all over her body" and exhaustion. (*Id.*) Bean denied receiving any previous psychiatric treatment. (*Id.*) Bean reported that she is able do to all the housework, but that her husband has to carry the laundry. She cooks simple "T.V. dinners and quick meals." (*Id.*)

According to Bean, "she is always in a fairly positive mood and has been an optimist." (R. 254.) She did admit to some suicidal thoughts, but denied any attempts. (*Id.*) She denied hallucinations, delusions, or psychotic symptoms. (*Id.*) She complained of extreme difficultly falling asleep at night and claimed she gets only two to four hours of sleep a night. (*Id.*)

Dr. Hilger's mental capacity assessment revealed adequate memory, minimal general knowledge and calculational ability, and fair conceptual reasoning, abstract reasoning, and judgment.  (R. 254-55.)  Dr. Hilger concluded that claimant possesses "at least low average intellectual functioning, if not higher, with limited 11th grade education."  (R. 255.)  He acknowledged claimant's history of fibromyalgia and arthritis and that she possessed "psychosocial stressors, mild, due to loss health concerns." (*Id.*)  He assessed claimant's GAF score as 65-70.  (*Id.*)  Dr. Hilger also concluded that claimant appeared to "have fair mental potential, depending more on her physical condition, to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation." (*Id.*)  Dr. Hilger did note that claimant had been engaging in physical type of work, and "may have to re-train into more sedentary, clerical, less physically stressful types of work activities."  (*Id.*)

Dr. Donald Henson conducted a Psychiatric Review Technique on June 15, 2008 and concluded that claimant has "no medically determinable impairment" or "coexisting nonmental impairment(s) that requires referral to another medical specialty."  (R. 257.) Dr. Henson noted that claimant "had no history of mental health services."  (R. 269.)  He acknowledged that claimant's pain limited some of her activities of daily living.  (*Id.*)

Reviewing state agency physician Dr. Richard Bilinsky reviewed the record on June 15, 2008 and concluded that claimant's impairments or combination of imapirments were non-severe.  (R. 271-73.)  Kirk Boyenga, Ph.D and Dr. Frank Norbury affirmed Dr. Bilinsky's determination on July 15, 2008 and July 17, 2008, respectively. (R. 274-76.)

### C.     Claimant's Testimony

Bean provided the following testimony at the administrative hearing.  At the time of the hearing, Bean was fifty-two years old.  (R.  43-44.)  She is married and resides with her husband.  (R. 44.)  She completed the eleventh grade, but never obtained her GED.  (*Id.*)

Claimant testified that she started her own house cleaning business and cleaned houses until 2005.  (R. 45.)  Claimant explained that she stopped working because she was having panic attacks and thought that her ex-husband was trying to kill her.  (R. 46.)  She stated that she still suffers from panic attacks several times a week when she is at home, and every time she goes out in public.  (*Id.*)  The attacks at home are triggered when she cannot perform certain tasks around the house that her husband expects her to perform.  (R. 47.)  Dr. Keller prescribed an anti-depressant, which "seemed to help a little bit," although she still gets very frustrated with her life and sits around and cries about once or twice a week.  (*Id.*)

As for her physical ailments, claimant explained that she has pain all over her body, which makes it difficult to work.  (R. 47-48.)  Her back and hip pain are the most debilitating.  (R. 48.)  She testified that she has been using a Fentanyl patch for approximately a year and has taken five Oxycodone a day for a year and a half.  (R. 48.)  She has also been receiving injections in her back.  (*Id.*)  Although these treatments provide some relief from fibromyalgia pain - which she describes as an achy pain "all over [her] body" - she cannot "get control of" the pain in her back and hip.  (*Id.*)  Bean also takes Gabapentin for the nerve pain in her feet.  (*Id.*)  When asked if there is any recommended course of treatment she did not agree to, Bean explained that she

declined Dr. Wolf's suggestion for back surgery because "it turned out really bad" for her mother.  (R. 50.)

When asked about her sleep problems, Bean testified that she takes Melatonin to help her fall asleep, but that she continues to wake up throughout the night.  (R. 50.) She explained that she uses her CPAP machine on some nights, although once she wakes up, she usually does not put the machine back on because it is a "hassle" and she does not want to wake her husband.  (R. 51.)

On a typical day, Bean wakes up to see her husband off to work, but usually gets back in bed due to lack of sleep the previous night.  (R. 50.)  While her husband is at work, Bean usually lays around and watches television.  (R. 51.)  On a daily basis, she drives one block to the post office to pick up her mail.  (R. 52.)  On occasion, she goes grocery shopping, although her husband usually goes with her.  (*Id.*)  Bean testified that she can do some chores, but her husband helps her with a lot of them, such as carrying the laundry and vacuuming.  (*Id.*)  She tries not to walk up the stairs in her house more than once a day because it is very painful to do so.  (R. 52-53.)

Bean testified that she can stand for approximately fifteen minutes before her back and hip pain sets in.  (R. 53.)  She can walk slowly through the grocery store before needing to stop and sit down.  (*Id.*)  Bean also testified that she has difficulty sitting still and can only do so for fifteen minutes before needing to change positions. (R. 54.)  The heaviest object Bean can lift is a gallon of milk, but she is unable to carry it.  (*Id.*)  Claimant explained that she has a lot of difficulty with her hands and drops almost everything she touches.  (R. 55.)

Bean further testified that she has good days and bad days when it comes to her

pain. (R. 55.) On her bad days, usually once a week, Bean sits and cries because she cannot get control of her pain. (R. 56.)

### D. Medical Expert's Testimony

Dr. Hugh Savage testified as the medical expert ("ME") at the administrative hearing. Dr. Savage first testified that claimant suffered from the following impairments: osteoarthritis, depression, carpal tunnel syndrome, sleep apnea syndrome, obesity, and fibromyalgia. (R. 59.) According to the ME, those impairments did not meet or equal any listed impairments. (*Id.*) ME Savage further opined that claimant would be limited to "light work" with occasional lifting and six hours of standing, walking or sitting in an eight hour day. (R. 60.) He recommended no unprotected heights, ladders, or scaffolds and noted that crouching and crawling should be done only occasionally. (*Id.*) ME Savage said that claimant could engage in frequent, but not continuous finger movement, and found no atmospheric environmental limitations. (*Id.*)

The ME went on to discuss his review of claimant's medical records. (R. 60-61.) In his opinion, the claimant's testimony regarding intractable pain all over her body was not supported by the chief complaints noted by her various physicians in the medical records. (R. 60.) He did agree, however, that the claimant has been prescribed substantial doses of strong pain medications and that the pain specialists would not prescribe those medications unless they believed she was suffering from pain. (R. 63-64, 85.)

### E. Vocational Expert's Testimony

Grace Gianforte testified as the vocational expert ("VE") at the hearing. The VE

described claimant's past work as a hybrid between an owner/manager/supervisor of a cleaning service and an office cleaner.  (R. 78-79.)  The VE concluded that the clamaint performed this position at the light to medium exertional level.  (R. 79.)

The ALJ then asked the VE to consider a hypothetical individual with the same age, education, and work experience as the claimant who (1) is limited to light work, (2) cannot climb ladders, ropes, or scaffolds, (3) can occasionally climb ramps and stairs, (4) can occasionally balance, stoop, kneel, crouch, and crawl, (5) should avoid unprotected heights and dangerous or moving machinery, and (6) is limited to frequent, but not repetitive or constant, handling and fingering.  (R. 79.)  When asked if such an individual could perform claimant's past work, the VE testified that the individual could work as a housekeeping supervisor.  (*Id.*)  The VE further testified that the hypothetical individual could perform other light level jobs in the national economy, including order checker (3,000 in the region), order filler (4,000 in the region), and counter service clerk (2,000 in the region).  (R. 79-80.)  The VE also explained that Bean had transferable skills to sedentary level positions, including appointment clerk and order clerk.  (R. 80.)

## II.    Legal Analysis

### A.    Standard of Review

We will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire

administrative record, but we will not "re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*

While the ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  But, the ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence…[and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B.    Analysis Under the Social Security Act

In order to qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one the Commissioner considers conclusively disabling, (4) if the claimant does not have a

conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon*, 270 F.3d at 1176.

The ALJ followed this five-step analysis. At step one, the ALJ found that claimant was not engaged in substantial gainful activity and had not been engaged in such activity since her alleged onset date of June 2, 2006. (R. 22.) At step two, the ALJ found that claimant had the severe impairments of fibromyalgia, obstructive sleep apnea, bilateral carpal tunnel syndrome, osteoarthritis, and obesity. (*Id.*) The ALJ concluded that claimant's depression was non-severe. (R. 22-24.) At step three, the ALJ determined that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24.) Next, the ALJ found that claimant has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a). Specifically, the ALJ concluded that the claimant was capable of frequent fingering and handling objects, occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps or stairs, but should never climb ladders, ropes or scaffolds, and should avoid all exposure to heights and dangerous or moving machinery. (R. 25.) At step four, the ALJ determined that the claimant was unable to perform any of her past relevant work. (R. 33.) Lastly, at step five, the ALJ found that claimant could perform alternative work in the national economy as an appointment clerk or order clerk. (R. 34.)

Claimant now argues that the ALJ erred in determining that claimant's mental impairment was non-severe, failed to afford the proper weight to her treating physician's

opinion, and failed to properly evaluate her credibility.

     **C.    The ALJ Did Not Err at Step Two When She Determined That Claimant's Depression Was Not Severe.**

     Claimant first argues that the ALJ erred in determining that her mental impairment was not severe. At step two, the ALJ concluded that claimant's mental impairment of depression was non-severe because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (R. 22.) According to Bean, the ALJ erred in reaching this conclusion because she improperly discounted the opinion of Dr. Keller and failed to recognize that subjective complaints are an acceptable means by which to measure mental impairments.

     To determine whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations, the ALJ must follow a "special technique" set forth in the regulations. 20 C.F.R. § 404.1520a(a); *see also Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). This technique requires the ALJ to determine first whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If the claimant is found to have such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(b)(2), (c)(3). These four areas are known as the "B criteria." *Craft*, 539, F.3d at 674. According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are found, then the adjudicator will "generally" conclude that the claimant's mental impairment is

not "severe."  20 C.F.R. § 404.1520a(d)(1).

Further, it is well settled that a treating physician's opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).  "An ALJ must minimally articulate her reasons for discounting a treating source's opinion."  *Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1082 (N.D. Ill. Oct.21, 2011) (internal quotations omitted).

Contrary to the claimant's assertion, the ALJ did not err in discounting Dr. Keller's assessment and sufficiently articulated her reasons for doing so.  After discussing the assessments of Dr. Hilger, the reviewing state agency consultants, and Dr. Keller, ALJ Martin concluded that Bean suffered from only mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence, or pace, and had experienced no episodes of decompensation.  In reaching this conclusion, the ALJ gave Dr. Keller's assessment "little weight," finding that it was "more limiting than the evidence of record or the claimant's activities of daily living warrant."  (R. 24.)  The ALJ also pointed out that Dr. Keller's assessment was based upon the claimant's "subjective complaints rather than her own clinical findings or review of the claimant's medical records/history."  (*Id.*)  While claimant is correct that subjective complaints may play a particularly important role in the assessment and treatment of mental impairments, the Seventh Circuit has made clear that if a treating physician's opinion is "based solely on the patient's subjective complaints, the ALJ may discount it."  *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, absent contemporaneous treatment notes supporting Dr. Keller's opinion set forth in the "Psychiatrist/Psychological Impairment Questionnaire," the ALJ properly discredited that opinion. S*ee Lopez v. Astrue,* 807 F. Supp. 2d 750, 753 & 766-67 (N.D. Ill. 2011) (finding that the ALJ properly discounted the opinion of a treating physician that had "little or no support in the medical record," was likely based on the claimant's "subjective complaints rather than objective findings," and that was not accompanied with treatment notes). And again, although Dr. Keller's treatment records were eventually submitted to the Appeals Council, we cannot consider them as a basis for reversible remand because they were not presented to the ALJ. *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

Lastly, we note, as did the ALJ, that Dr. Keller diagnosed claimant with a GAF score of 55-60, which indicates mild to moderate symptoms. This score is inconsistent with some of the marked functional limitations Dr. Keller described. Naturally, such an internal inconsistency supports the ALJ's decision to afford Dr. Keller's opinion little weight. *See Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion...when the treating physician's opinion is internally inconsistent.") (citations omitted).

For all of these reasons, we conclude that the ALJ did not improperly discredit the opinion of Dr. Keller. As a result, the ALJ's step two determination that Bean's depression was not severe does not require remand.

### D.     The ALJ Failed to Build a Logical Bridge from the Evidence to her Conclusion that Claimant Could Perform Sedentary Work.

Claimant also argues that the ALJ failed to properly evaluate Dr. Wolf's opinion

when assessing her RFC and failed to properly evaluate her credibility. On these points, we agree.

The RFC is the most a claimant can still do despite her limitations. *Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009) (quotations omitted). The RFC "is based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family." *Craft v. Astrue*, 539 F.3d at 676 (*citing* 20 C.F.R. § 404.1545(a)(3)). "The ALJ is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding." *Id.*

Here, in making her RFC determination, ALJ Martin first explained that she gave Dr. Wolf's October 2008 opinion little weight, finding that it represented an "acute flare up in the claimant's condition." (R. 30.) ALJ Martin went on to give Dr. Wolf's July 2009 opinion "some weight," and explicitly noted that it "indicates that the claimant is capable of performing sedentary work." (R. 31.) But next, the ALJ contradictorily stated that "the postural and manipulative limitations indicated by Dr. Wolf are more limiting than the medical evidence indicates." (*Id.*) Like the claimant, this is where we lose track of the so-called logical bridge.

A review of Dr. Wolf's July 2009 opinion reveals that she determined claimant could frequently lift and carry zero to five pounds, occasionally lift and carry five to ten pounds, sit for three to four hours in an eight-hour day, stand/walk for one hour in an eight hour day, and must get up and move around every fifteen minutes. This assessment is not in fact consistent with sedentary work as described by the Social Security Administration. *See* SSR 96-9p, 1996 WL 374185, *6 ("In order to perform a

full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday...").  And, although it appears the ALJ chose to discredit the postural and manipulative limitations set forth by Dr. Wolf, her conclusory statement that those limitations "are more limiting than the medical evidence indicates," is insufficient to support that decision.  As a result, remand is required.  On remand, the ALJ should also take care to consider the factors set forth in 20 CFR § 404.1527(c)(2).

As for claimant's attack on the ALJ's credibility assessment, we recognize that the claimant faces an uphill battle.  In order to succeed on this ground, claimant must overcome the highly deferential standard we afford credibility determinations.  Because the ALJ is in the best position to evaluate the credibility of a witness, we only reverse an ALJ's credibility finding if it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, "the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."  *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).

Further, when an individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding based on a consideration of the entire case record.  SSR 96-7p, 1996 WL 374186, at *2.  In making such a determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  The ALJ must also consider (1) the claimant's daily activities; (2)

the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3) factors that precipitate and aggravate those symptoms; (4) the type, dosage,

effectiveness, and side effects of any medication that the claimant takes or has taken to

alleviate pain or other symptoms; (5) treatment, other than medication, the claimant

receives or has received for relief of pain or other symptoms; (6) any measures other

than treatment the claimant uses or has used to relieve pain or other symptoms; and (7)

any other factors concerning the claimant's functional limitations and restrictions due to

pain or other symptoms.  SSR 96-7p, 1996 WL 374186, at *3.

Here, we find that the ALJ failed to provide a proper credibility assessment

regarding claimant's allegations of pain and functional limitations.  Apart from the

circular boilerplate language, *see Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012),

and a conclusion that the claimant's allegations are not supported by the medical

evidence, the ALJ commented only briefly on the claimant's decision not to see a

rheumatologist or participate in physical therapy.  In our view, the ALJ failed to

sufficiently address the factors set forth in SSR 96-7p, particularly the claimant's daily

activities and purported limitations.  Even more perplexing is the fact that at one point,

the ALJ stated that the claimant's allegations of pain were "persuasive," yet failed to

sufficiently articulate how, despite those allegations of debilitating pain, claimant could

still perform sedentary work.  Because we are unable to trace the ALJ's reasoning,

remand is required.

III.    **Conclusion**

For the reasons set forth above, claimant's motion for summary judgment [16] is

granted in part and this case is remanded to the Social Security Administration for

further proceedings consistent with this Opinion.  It is so ordered.


**ENTERED:**


_____
**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated:**        **July 27, 2012**